IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

VIRGINIA ANN ALLISON,        )
                                    )
              Plaintiff,      )
                                    )
              v.           )        1:16CV596
                                    )
NANCY A. BERRYHILL,[1]      )
Acting Commissioner of Social Security,  )
                                  )
            Defendant.    )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Virginia Ann Allison brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. §§ 405(g) & 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (the "Act"). The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.    PROCEDURAL HISTORY

Plaintiff protectively filed her application for Disability Insurance Benefits (DIB) in July 2012, and filed her concurrent application for SSI in November 2012. (Tr. at 217, 221.)[2] She initially alleged a disability onset date of September 10, 2010. (Id.) Plaintiff's application was

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn W. Colvin as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Transcript of Record [Docs. #7].

denied initially and upon reconsideration (Tr. at 80-142). Thereafter, she requested a hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 143.) Plaintiff, her attorney, an impartial medical expert, and an impartial vocational expert attended the subsequent hearing on October 20, 2014. (Tr. at 34.) At her hearing, Plaintiff amended her disability onset date to July 25, 2013. (Tr. at 38.) Following the hearing, the ALJ determined that Plaintiff was not disabled within the meaning of the Act (Tr. at 28) and, on April 11, 2016, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-3).

## II.  LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation and brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270

F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal quotation and brackets omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[1]

_____

[1] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects

"The Commissioner uses a five-step process to evaluate disability claims." <u>Hancock</u>, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." <u>Id.</u>

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." <u>Bennett v. Sullivan</u>, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." <u>Mastro</u>, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." <u>Id.</u> at 179.[2] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can

relevant here, substantively identical." <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

[2] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." <u>Hines</u>, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses

"perform past relevant work"; if so, the claimant does not qualify as disabled.  Id. at 179-80.

However, if the claimant establishes an inability to return to prior work, the analysis proceeds

to the fifth step, which "requires the Commissioner to prove that a significant number of jobs

exist which the claimant could perform, despite [the claimant's] impairments."  Hines, 453 F.3d

at 563.  In making this determination, the ALJ must decide "whether the claimant is able to

perform other work considering both [the claimant's RFC] and [the claimant's] vocational

capabilities (age, education, and past work experience) to adjust to a new job."  Hall, 658 F.2d

at 264-65.  If, at this step, the Government cannot carry its "evidentiary burden of proving that

[the claimant] remains able to work other jobs available in the community," the claimant

qualifies as disabled.  Hines, 453 F.3d at 567.

III.   DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful

activity" since her alleged onset date.  She therefore met her burden at step one of the sequential

evaluation process.  At step two, the ALJ further determined that Plaintiff suffered from the

following severe impairments:

depression; anxiety; asthma; obesity; and history of right knee injury with pain.

(Tr. at 22.)

---

the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)."  Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)."  Hines, 453 F.3d at 562 63.

The ALJ found at step three that these impairments did not meet or equal a disability listing. (Id.) Accordingly, he assessed Plaintiff's RFC and determined that Plaintiff could perform:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she would have to avoid balancing or climbing. Her ability to perform postural activities such as stooping, crouching, kneeling, and crawling is on an occasional basis. She is incapable of working at heights or around dangerous machinery. She is incapable of working in an environment with respiratory irritants such as dust, fumes, smoke, high humidity, or temperature extremes. She is limited to simple, routine and repetitive tasks, in an environment with no more than occasional interaction with co-workers and supervisors. She would have to avoid any interaction with the public, and is unable to work at jobs requiring complex decision-making, constant change, or dealing with crisis situations.

(Tr. at 24.) Based on this determination, the ALJ found at step four of the analysis that Plaintiff could not return to her past relevant work. However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, Plaintiff could perform other jobs available in the community and therefore was not disabled. (Tr. at 27-28.)

Plaintiff now challenges the ALJ's decision on four bases. First, Plaintiff contends that the ALJ improperly evaluated the opinion of the consultative psychological examiner. Second, Plaintiff contends that the ALJ failed to properly evaluate the opinion evidence from her medical sources. Third, Plaintiff contends that the ALJ failed to account for her limitations in concentration, persistence, and pace as required by Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). Finally, Plaintiff contends that the ALJ failed to properly consider and analyze Plaintiff's symptoms. The Court considers each contention in turn.

A.    Dr. Pope's Consultative Psychological Examination Report

Plaintiff first challenges the ALJ's treatment of a report prepared by Dr. Jane Pope after she conducted a psychological examination of Plaintiff on April 12, 2011. Dr. Pope states in the "Summary and Conclusions" section of her report that:

> The claimant was able to understand, retain, and follow simple instructions over a short period of time in one-on-one setting. It is unclear how well she could sustain attention to perform repetitive tasks. She may have difficulty relating to others at time[s]. Tolerating the stress and pressure associated with day-to-day work activity may have much more to do with her physical problems than her psychiatric problems at the present time.

(Tr. at 409.) The ALJ placed "some weight" on this report, as follows:

> The undersigned placed some weight in the April 2011 consultative psychological examination report (Ex. B4F), as the record evidence reflects the claimant's mental health issues have gotten better with treatment.

(Tr. at 26.) The ALJ then stated that he also placed "some weight" on the April 2011 consultative physical examination, which was prepared by Dr. Samia on April 11, 2011. (Tr. at 26, 403-05.) As to the consultative physical examination, the ALJ found as follows:

> Some weight was afforded to the April 2011 consultative physical examination. The undersigned agrees with the examination findings as being consistent with the record evidence. However, the examiner did not provide any work limitations (Ex. B4F).

(Tr. at 26.)

Plaintiff now challenges the ALJ's evaluation of the psychological report, contending that the ALJ found that the report was consistent with the record but that the ALJ then failed to include the examiner's findings regarding mental limitations. (Pl.'s Mem. [Doc. #10] at 3-5.) Plaintiff also contends that the ALJ erred in finding that the psychological report failed to

include specific work limitations, since the psychological report did include specific work limitations. (Pl.'s Mem. at 3-4.) However, as set out above, the ALJ stated that he gave the <u>psychological</u> examination report only some weight because the "record evidence reflects the claimant's mental health issues have gotten better with treatment." (Tr. at 26.) Then, turning to the consultative <u>physical</u> examination report, the ALJ gave that report some weight because he found it consistent with the record evidence but the examiner did not provide any work limitations. Exhibit B4F, to which the ALJ referred when making these findings, includes both the psychological and the physical consultative examinations, and the report of <u>psychological</u> consultative examination includes work limitations, as noted by Plaintiff, while the report of the <u>physical</u> consultative examination does not include any work limitations, as noted by the ALJ. Thus, it appears that Plaintiff's first argument is based upon a misreading of the ALJ's basis for his giving only some weight to the report of Plaintiff's April 2011 consultative psychological examination.

With respect to the consultative psychological examination report, the ALJ accorded only some weight to that report based on the finding that "the record evidence reflects the claimant's mental health issues have gotten better with treatment." (Tr. at 26.) Plaintiff does not challenge the ALJ's finding that Plaintiff's mental health improved with treatment, a finding which implicitly acknowledges that the report was prepared in April 2011, and refers to a time period of more than two years prior to Plaintiff's alleged date-of-onset of her disability on July 25, 2013. In concluding that Plaintiff's mental health issues have improved with treatment over that extended period of time, the ALJ set out the records of Plaintiff's mental health treatment in

January and April 2013 and in January through June 2014. (Tr. at 25-26, 446, 448, 512-14, 497-98, 499-503, 495.) For example, after Plaintiff's alleged onset date in July 2013, she received mental health treatment only during January through June 2014, and those records reflect an expected decrease in Plaintiff's anxiety and depression with treatment (Tr. at 517), that Plaintiff wanted to find a job (Tr. at 513), that her attention and concentration were good (Tr. at 505), that she had some benefit with increased dosage of her medication (Tr. at 498), and that she was doing well (Tr. at 495). The ALJ specifically noted that in the last mental health treatment record in June 2014, Plaintiff had

> decreased panic/anxiety. She increased coping skills to manage anxiety and increased functioning. The claimant was attending classes two days a week at Durham Tech for medical assistance training. She stated that her anxiety increased when first going to class, but then she settles in. She told treating providers that she had been involved in some musical activities in her neighborhood, consisting of a bunch of good people. Response to treatment was stable.

(Tr. at 26, 494).

Thus, the Court finds that Plaintiff's first argument is based upon a misreading of the ALJ's basis for his giving only some weight to the report of Plaintiff's April 2011 consultative psychological examination, and the Court further finds that the ALJ's evaluation of the April 2011 consultative psychological examination was supported by substantial evidence.[3]

---

[3] The Court also notes that Plaintiff's argument appears to misstate Dr. Pope's conclusions. Plaintiff argues that based on Dr. Pope's report, the ALJ should have included in Plaintiff's RFC a finding that Plaintiff could understand, retain, and follow simple instructions for less than 2 hour increments and could follow simple directions only with one on one supervision. (Pl.'s Mem. at 4 5.) However, Dr. Pope concluded that Plaintiff "was able to understand, retain, and follow simple instructions over a short period of time in one on one setting" based on Plaintiff's ability to follow instructions during the consultative examination. Dr. Pope did not define a "short period of time" and did not opine that Plaintiff could not sustain attention, concentration, and persistence or pace for two hour increments. Similarly, while Dr. Pope's report indicated that Plaintiff could understand and follow instructions that she received in a one on one setting, Dr. Pope does not opine that Plaintiff would need constant one on one supervision. Thus, contrary to Plaintiff's contentions, Dr. Pope's

B.    ALJ's Evaluation of the Medical Opinion Evidence

Plaintiff next argues that the ALJ erred by failing to properly evaluate the opinion of two examiners that Plaintiff argues were treating physicians: Geoffrey Zegar, ACSW, LCSW, and Sarah Potter, PA-C.  (Pl.'s Mem. at 5-10.)  Plaintiff refers to Geoffrey Zegar as her "treating therapist" and Sarah Potter as her "treating physician's assistant."  Plaintiff appears to contend that these providers should be considered treating physicians whose opinions are entitled to controlling weight pursuant to the "treating physician rule" set out in 20 C.F.R. § 404.1527(c) and § 416.927(c).  The "treating physician rule" generally requires an ALJ to give controlling weight to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c) and § 416.927(c).  However, under 20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2), a "treating physician" must be a "treating source."  A "treating source" is defined in 20 C.F.R. § 404.1527(a)(2) and § 416.927(a) as an "acceptable medical source."  Under 20 C.F.R. § 404.1502(a) and § 416.902(a), for claims filed before March 27, 2017, as was Plaintiff's claim, an "acceptable medical source" means a medical source who is either a licensed physician, licensed psychologist, licensed optometrist, licensed podiatrist, or a qualified speech-

---

report would not provide a basis for limiting Plaintiff's RFC as to her ability to sustain attention in a work setting or her ability to work independently to the extent Plaintiff suggests.  However, the Court need not address these issues further, since the ALJ evaluated and weighed Dr. Pope's report as set out above, and that determination is supported by substantial evidence.

language pathologist. See also SSR 06-03p.[4] Plaintiff does not contend that either Geoffrey Zegar or Sarah Potter fall into any of these categories. In contrast to other health care providers, only "acceptable medical sources" may establish the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight. See SSR 06-03p. Therefore, to the extent Plaintiff contends that either Mr. Zegar or Ms. Potter are "treating physicians," that argument must be rejected. See Diaz v. Colvin, Civil Action No. 8:13-705-RMG, 2014 WL 3887856, at *22 (D.S.C. Aug. 5, 2014) (licensed social worker and physician's assistant are not "acceptable medical sources" as defined in the regulations).

However, even though they are not "treating physicians," information provided by medical sources such as Mr. Zegar and Ms. Potter "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p. Therefore, evidence from medical sources who are not "acceptable medical sources" should still be evaluated using the same relevant factors. Id. These factors include: how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty

---

[4] The Court notes that for claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96 2p and SSR 6 03p, have been rescinded. The new regulations broaden the definition of "acceptable medical source," but provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c, § 416.920c. The claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's contentions pursuant to the rules set out above.

or area of expertise related to the individual's impairment(s), and any other factors that tend to support or refute the opinion. Id.

In this case, the ALJ gave "little weight" to the opinion of Physician's Assistant Potter ("PA Potter") which was offered in a medical source statement dated July 24, 2014. (Tr. at 26.) In that statement, PA Potter identified Plaintiff's diagnoses as depression, anxiety, PTSD, history of A-fib, asthma, and a right knee injury one year ago. (Tr. at 530.) PA Potter wrote that Plaintiff has no work capacity and that Plaintiff has "[d]ifficulty doing physical activity due to asthma and right knee injury." (Id.) PA Potter also stated that Plaintiff has "[d]ifficulty with psychological aspects due to mental illness," although she added that she does not treat Plaintiff for mental illness. (Id.)

In considering this statement, the ALJ noted that the record contains a medical report of an examination of Plaintiff on July 23, 2014, the day before PA Potter completed this medical source statement. This treatment record notes that Plaintiff's illness is asthma without status asthmaticus. (Tr. at 26, 523.) The treatment record also notes that on examination, Plaintiff's lung examination was unremarkable, and Plaintiff's lungs were "clear to auscultation bilaterally; no wheezes, rales, ronchi." (Tr. at 26, 525.) The ALJ noted that the next day, PA Potter completed her medical source statement, "wherein it was opined the claimant is unable to perform full-time work based on her asthma and right knee injury." (Tr. at 26.) The ALJ found that:

> The undersigned placed little weight in this opinion, given the record evidence demonstrates minimal treatment for her right knee with a normal gait in June 2014; and an unremarkable lung examination in July 2014, with no status asthmaticus.

(Tr. at 26.) In addition, to the extent that the medical source statement described and relied upon Plaintiff's mental impairments, the ALJ noted that "Mrs. Potter related that she does not treat the claimant for her mental illness," and little weight was assigned to the opinion statement. (Tr. at 26.) Finally, the ALJ's review of the evidence also noted PA Potter's treatment notes from June 2014, the month before the statement, which reflected that Plaintiff had not been seen in a year, she had not followed up for the knee pain, she was not taking any pain medication, her lungs were clear, and she had right knee tenderness but with normal gait and strength of 4+/5. (Tr. at 25, 473-74.)[5]

Plaintiff argues that substantial evidence does not support the ALJ's decision to give little weight to PA Potter's opinion because in January 2010 Plaintiff was hospitalized for asthma exacerbation, in March and April of 2011 Plaintiff had increasing anxiety with difficulty breathing, in June 2012 Plaintiff's asthma was characterized as "uncontrolled," and in January 2013 Plaintiff complained of worsening asthma symptoms. (Pl.'s Mem. at 10.) Yet, this evidence all relates to the period prior to Plaintiff's July 25, 2013, onset date. The ALJ relied on evidence describing Plaintiff's asthma condition closer to her onset date. For example, he noted that in an annual exam in June 2013, the frequency of her use of a rescue inhaler was rare, there was no wheezing or shortness of breath or cough, and there was no recent exacerbations/ER visits/hospitalizations. (Tr. at 25, 485.) Her lungs were clear and there was no respiratory distress. (Tr. at 486.) The status of her asthma was described as "controlled," and at a stage of

_____

[5] As reflected in the ALJ's decision, the medical records reflect that Plaintiff sought medical treatment in July 2013 for an alleged injury to her knee a month earlier. (Tr. at 477 80.) She did not follow up for x rays or a visit with an orthopedist as recommended. Her next visit was a year later in June 2014, and the treatment record for that visit reflects that she was not taking any pain medication and she had right knee tenderness but with normal gait and strength of 4+/5. (Tr. at 471 73.)

"mild persistent." (Tr. at 487.) The ALJ also relied upon the treatment record of July 23, 2014, recounted above, which found that Plaintiff had clear lungs with no wheezes, rales, or rhonchi. (Tr. at 26, 525.) Thus, the ALJ properly focused on the medical evidence during the relevant time period, from the alleged onset date through the date of the decision. Moreover, in specifically considering PA Potter's medical source statement, the ALJ considered the inconsistency between the medical source statement and the medical treatment records during that same month. For these reasons, the Court finds that substantial evidence supports the ALJ's decision to give little weight to PA Potter's opinion that Plaintiff was disabled due to her right knee injury and asthma condition. Finally, because PA Potter admittedly was not treating Plaintiff for any mental illness, her opinion on Plaintiff's difficulties with psychological issues was properly afforded little weight.

Turning now to the evidence presented by Plaintiff's social worker, Mr. Zegar, Plaintiff argues that the ALJ erred by giving the opinion of Mr. Zegar "little weight." Mr. Zegar's report is dated October 6, 2014. (Tr. at 531-33.) In the report, Mr. Zegar states that he has seen Plaintiff for individual therapy since April 7, 2014. He says that Plaintiff presently complains of "ongoing mixed depressive/anxious symptoms including low energy/worry/difficulty leaving the house/anhedonia/sporadic suicidal thoughts (no active plan at this time) and difficulty with concentration." (Tr. at 531.) He also says that Plaintiff can be "tearful and labile" in treatment sessions. (Id.) Mr. Zegar checked "yes" to the question whether these psychological impairments affect Plaintiff's ability to complete an eight-hour workday or forty-hour work week without interruptions from psychologically-based symptoms. (Id.) He also checked "yes" to the

question whether, if Plaintiff attempted full-time employment, her mental impairments would likely take her off-task more than 20% of the time during a typical (full-time) workday or workweek. (Id. at 532.) Mr. Zegar explained that since beginning treatment with him, Plaintiff "has made attempts at engaging in various productive activities only to cease these activities as symptoms were exacerbated." (Id.) Mr. Zegar also checked "no" as to whether, if Plaintiff attempted full-time employment, she would consistently be able to perform activities within a schedule, maintain regular attendance, and be punctual. He explained that Plaintiff had attempted to take a light course load at Durham Technical Community College only to have to withdraw after having an escalation of symptoms. (Id.) He also opined that it was "unknown" whether Plaintiff could consistently accept instructions and respond appropriately to supervision in a workplace. (Tr. at 533.) Mr. Zegar said he based his answers on his clinical observations, self-reports by client, follow-up assessments, monitoring of progress, and evaluation of effectiveness of plans discussed in session. (Id.)

The ALJ discounted Mr. Zegar's opinions and gave his report little weight. The ALJ first noted that the report was "primarily based upon [Plaintiff's] self-reports." (Tr. at 26.) Plaintiff claims that this reason is "simply not founded in the evidence." (Pl.'s Mem. at 7.) However, Mr. Zegar specifically states in the report that one of the bases for the answers provided was "self-reports by client." (Tr. at 533.) In addition, in response to a question asking him to describe the signs and symptoms of Plaintiff's mental impairments, Mr. Zegar stated that Plaintiff "has a long history of waxing/waning depressive/anxious signs/symptoms which became pronounced and intrusive in 2009 when her mother died." (Tr. at 531.) However, it is undisputed that Plaintiff

first saw Mr. Zegar in 2014, so his description of her symptoms prior to that time are based on her reports to him. Similarly, in continuing to describe the signs and symptoms of Plaintiff's mental impairments, Mr. Zegar states that "[c]urrently she describes ongoing mixed depressive anxious symptoms including low energy/worry/difficult leaving the house/anhedonia/sporadic suicidal thoughts (no active plan at this time) and difficulty with concentration." (Tr. at 531.) Thus, as to Plaintiff's current symptoms, Mr. Zegar's report specifically reflects that his account is based on what Plaintiff has described to him. The only observations he adds are that "[s]he can be tearful and labile in [treatment] sessions." (Tr. at 531.) Thus, the above bases given by Mr. Zegar for his opinions all primarily relate to what Plaintiff told him during their sessions. Therefore, the ALJ's decision to discount Mr. Zegar's opinion because "it is primarily based upon the claimant's self-reports" is supported by the evidence. In weighing Mr. Zegar's opinion, the ALJ also noted that Plaintiff had only been treated by Mr. Zegar since April 2014, and that Plaintiff had not sought mental health treatment since June 2014. (Tr. 26.) Plaintiff concedes that she only had three sessions with Mr. Zegar before he wrote the report at issue. Those dates appear to be April 7, 2014, May 12, 2014, and June 23, 2014. (Tr. at 502, 497, 494.) Plaintiff does not contest the ALJ's finding that Plaintiff had not sought mental health treatment since June 2014. Thus, the ALJ considered the extent of the treating relationship, the fact that Plaintiff had not begun seeing Mr. Zegar until April 2014, and the fact that Plaintiff had last seen Mr. Zegar in June 2014, over four months before he wrote his report. Therefore, the ALJ's considerations are consistent with the factors set out in 20 C.F.R. § 404.1527(c) and SSR 06-03P, and are well-supported by the record evidence.

Plaintiff cites some of the findings of Mr. Zegar in his progress notes from the three sessions to support her argument that the ALJ should have afforded more weight to Mr. Zegar's opinions. However, a review of the totality of the findings supports the ALJ's assignment of little weight to his opinion. In April 2014, Mr. Zegar noted that Plaintiff reported that she had variable anxiety and depression, and she described ongoing periods of anxiety and depression that can be debilitating. (Tr. at 502.) The results of Mr. Zegar's mental status exam was that Plaintiff's appearance was appropriate, her level of alertness was normal, her attitude was cooperative, she was oriented x4, her eye contact was variable, her mood was anxious, her affect was tense, her speech was normal, her thought process was goal-directed, her perception was normal, and her concentration, memory, insight, and judgment were all fair. (Id.) Her GAF was 50.

Mr. Zegar's next progress notes are for May 12, 2014. (Tr. at 497.) Many of his observations are the same as those in his April report. Plaintiff reported to be meditating daily and considering returning to school. Her appearance was appropriate, her level of alertness was normal, her attitude was cooperative, she was oriented x4, her eye contact was variable, she was fidgety and anxious, her affect was appropriate, her speech was normal, her thought process was goal-directed, her perception was normal, and her concentration, memory, insight and judgment were all fair. (Id.) Her GAF was 52-54.

The last of Mr. Zegar's progress notes is from June 23, 2014. (Tr. at 494.) Plaintiff reported that her anxiety was about the same. The report states that Plaintiff goes to Durham Technical College for medical assisting classes for two classes two days per week. It also states

that Plaintiff has been involved with some musical activities in her neighborhood, " a bunch of good people and it doesn't kick up" her anxiety. But she continues to have feelings of "not being ok." The mental status exam results are essentially the same as in the earlier report. Her GAF is reported as 46-48.

The ALJ considered these three progress reports of Mr. Zegar as shown by the citation of the three GAF scores in the ALJ's opinion. (Tr. at 25-26.) Plaintiff fails to cite any specific parts of these reports that would support Mr. Zegar's opinion that Plaintiff could not work. For all of these reasons, Plaintiff's argument that the ALJ failed to properly evaluate the medical opinion evidence should be rejected.

C.        The ALJ's RFC Finding and Hypothetical Question

Plaintiff next argues that the ALJ failed to comply with the requirements of Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), by failing to include a limitation in Plaintiff's RFC to account for an inability to stay on task. In Mascio, the Fourth Circuit addressed the question of whether and how moderate limitations in concentration, persistence, and pace found at step two of the sequential evaluation must be accounted for in the RFC assessment. 780 F.3d at 638. The Fourth Circuit specifically held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." Id. (quotation omitted). This is because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." Id. The Fourth Circuit further noted that "[p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration,

persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity.  For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert.  But because the ALJ here gave no explanation, a remand is in order."  Id. (internal citation omitted).

In the present case, as in Mascio, the ALJ found at step three of the sequential analysis that Plaintiff had moderate difficulties in concentration, persistence, or pace.  The RFC then limited Plaintiff to "simple, routine and repetitive tasks, in an environment with no more than occasional interaction with co-workers and supervisors.  She would have to avoid any interaction with the public, and is unable to work at jobs requiring complex decision-making, constant change, or dealing with crisis situations."  (Tr. at 24.)  Plaintiff now argues that these limitations fail to adequately address her mental limitations in light of Mascio.  However, the Fourth Circuit's decision in Mascio

> "does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision. . . .
>
> An ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court."

Tolbert v. Colvin, 1:15CV437, 2016 WL 6956629, at *9 (M.D.N.C. Nov. 28, 2016) (finding that RFC limitations to "simple, routine, repetitive tasks with simple, short instructions, in a job that required making only simple, work-related decisions, involved few workplace changes,  and

required only frequent contact with supervisors, co-workers, or the public" sufficiently accounted for a Plaintiff's moderate limitations in concentration, persistence, or pace in light of the ALJ's explanation throughout the administrative decision) (quoting Jones v. Colvin, No. 7:14CV00273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015)).

In this case, as in Tolbert, the ALJ sufficiently explained why Plaintiff's limitations in concentration, persistence, or pace were accounted for by the RFC in this case. First, the RFC in this case is much more detailed than in Mascio, and the hypothetical question to the Vocational Expert was likewise more detailed. In addition, the ALJ included an extended review of the evidence regarding Plaintiff's mental impairments, with findings regarding the extent of those impairments based on the medical record. Specifically, the ALJ found that "[w]ith regard to concentration, persistence or pace, the claimant has moderate difficulties. While the claimant testified that her focus is not very good, the record evidence shows she had adequate attention and concentration at various office visits." (Tr. at 23.) The ALJ cites to exhibits B6F and B8F. Plaintiff does not specifically challenge this finding. This medical evidence shows that during examinations on May 31, 2014, April 12, 2014, and March 8, 2014, Plaintiff's attention and concentration were found to be "good." (Tr. at 495, 498, 505.) In reviewing the evidence, the ALJ separately noted that Plaintiff's treatment records from May 12, 2014 reflect that "[h]er attention and concentration were good, and memory was intact." (Tr. at 25.) In addition, the ALJ placed "great weight" on the State agency assessments in the record. (Tr. at 26.) One of these assessments found that as of May 1, 2013, Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, but she was "capable of

performing short and simple tasks and is able to maintain attn and concentration well enough to complete." (Tr. at 107.) The same findings are present in the initial assessment dated September 14, 2012. (Tr. at 91.)

Thus, unlike a case where the ALJ finds mental impairments and then limits Plaintiff to "unskilled" work without further explanation, here the ALJ considered Plaintiff's mental impairments at length, noted the inconsistencies between Plaintiff's contentions and the abilities reflected in the record including specifically as to her attention and concentration, set out the relevant findings from the medical records and opinions, tailored the RFC to take into account all of Plaintiff's functional limitations for which there was support in the record, and adopted a detailed RFC limiting Plaintiff to "simple, routine and repetitive tasks, in an environment with no more than occasional interaction with co-workers and supervisors. She would have to avoid any interaction with the public, and is unable to work at jobs requiring complex decision-making, constant change, or dealing with crisis situations." (Tr. at 24.)

This detailed analysis and RFC determination provides sufficient basis for review by the Court and is supported by substantial evidence.

D.      20 C.F.R. § 404.1529 and Monroe v. Colvin, 826 F.3d 176 (4th Cir. 2016)

Finally, Plaintiff argues that the ALJ failed to consider all of the evidence of her impairments in violation of 20 C.F.R. § 404.1529(c), and failed to create a logical bridge from the evidence to his conclusions in violation of Monroe v. Colvin, 826 F.3d 176 (4th Cir. 2016). Section 404.1529(c) explains how the Secretary evaluates a claimant's symptoms, and in Monroe, the court held that an ALJ must explain his decision sufficiently to allow for meaningful review

by the court. In this case, Plaintiff objects to the ALJ's treatment of her testimony regarding the nature and intensity of her symptoms, particularly her testimony regarding her crying spells, her lack of motivation, and her contention that she was unable to stand or walk for long periods due to her right leg injury. (Pl.'s Mem. at 12; Tr. at 43-45.)

However, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. at 25.) The ALJ then summarized the record evidence pertaining to Plaintiff's conditions from 2011 through October 2014. In addition, in initially considering the severity of Plaintiff's impairments as part of step two of the sequential evaluation, the ALJ considered Plaintiff's testimony. (Tr. at 23-24.) As part of this discussion, the ALJ noted Plaintiff's testimony regarding caring for her dog, shopping, doing housework, musical activities, and her ability to focus. (Tr. at 23.) Plaintiff contends that the ALJ mischaracterized her testimony. However, she did testify that she took her dog for a walk daily (Tr. at 46), that she goes to Family Dollar to shop for small things (Tr. at 47), and that she does housework although she is not "motivated much by it" (id.). The ALJ's statement that Plaintiff had been involved in some musical activities in her neighborhood is supported by the record (Tr. at 494), as is the finding that she was attending classes at Durham Technical College in June 2014 (id., although she testified that she never started those classes (Tr. at 48). In addition, although the ALJ did not specifically discuss Plaintiff's testimony regarding her crying spells, in his summaries of Plaintiff's medical evaluations he noted that in June 2013 Plaintiff's mood was stable with "normal mood and affect." (Tr. at 25.) Also, he noted that on July 25, 2013, Plaintiff was reported to have

normal mood and affect.  (Id.)  The ALJ recognized that in May 2014, Plaintiff was reported as having a depressed mood although "somewhat improved."  (Id.)  Finally, in June 2014, the ALJ noted that Plaintiff was back to normal mood and affect.  (Id.)  Given the evidence in this case and the information set out in the ALJ's decision, the Court concludes that the ALJ's observations, combined with the ALJ's review of the medical evidence of record, shows that substantial evidence supports his evaluation of Plaintiff's symptoms and the effect of those symptoms on her ability to work.  In the circumstances, the ALJ explained his decision sufficiently to allow for meaningful review.

IV.    CONCLUSION

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment [Doc. #9] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #11] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 31st day of August, 2017.

        /s/ Joi Elizabeth Peake        
United States Magistrate Judge